TRADE ARBED, INC.

v.

M/V SWALLOW, etc., et al.

Civ. A. No. 86–1637.

United States District Court,
E.D. Louisiana.

June 17, 1988.

John B. Gooch, Jr., and Stanley Mc Dermott, III, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, La., for plaintiff.

Robert B. Deane and John H. Clegg, Chaffe, McCall Phillips, Toler & Sarpy, New Orleans, La., for defendants.

## OPINION

CHARLES SCHWARTZ, Jr., District Judge.

This matter came before the Court for nonjury trial. Having considered the evidence, the parties' memoranda and the applicable law, the Court rules as follows. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are so adopted.

### Introduction

The instant suit alleges losses resulting from salt water corrosion of consignments of steel plate lifted aboard the M/V SWALLOW in Galatz, Rumania for shipment to the United States ports of New Haven, Savannah, Mobile and New Orleans. Plaintiff also alleges losses resulting from salt water corrosion of consignments of steel pipe lifted aboard the vessel in Constanza, Rumania for shipment to New Haven and Savannah. The combined losses claimed for all four ports are as follows [1]:

| CITY | CARGO | AMOUNT | BILL OF LADING |
|------|-------|--------|----------------|
| New Haven | Plate | $105,635.02 | # 1, 3–15 |
| | Pipe | 133,586.80 | # 1, 2, 3, 4–6, 10, 12, 15 & 20 |
| Savannah | Plate | 133,407.56 | # 1–24 |
| | Pipe | 21,958.25 | # 1 |
| Mobile | Plate | 139,921.08 | # 10, 12, 13 |
| New Orleans | Plate | 140,000.00 | # 17 |
| | | $674,508.71 | |

These alleged losses are based primarily upon discounts negotiated between plaintiff or its underwriters and plaintiff's customers.

As will be explained more fully below, the Court concludes that conflicting evidence preponderates in favor of the plaintiff on the issue of liability for damage to cargo covered by certain of the bills of lading in question. As to these bills of lading, the Court concludes that reasonable damages may be calculated on the basis of a proportionate share of negotiated discounts and certain salvage sales, plus a lodestar factor of ten per cent, given recovery will be allowed only for cargo proven to have been damaged and absent proof of damages based upon fair market value.

### Findings of Fact

The parties stipulated that plaintiff, Trade Arbed, Inc., is a corporation engaged in the businees of purchasing and importing steel products, including steel plate and pipe, for resale to customers in the United States. Defendant, Swallow Shipping Ltd., was at all pertinent times the owner of the M/V SWALLOW, a bulk carrier engaged in the common carriage of cargo, including steel plate and pipe. Defendant, Triaina Maritime S.A., was at all pertinent times the operator of the M/V SWALLOW. Swallow filed a claim as owner of the M/V SWALLOW, in response to plaintiff's *in rem* action against the vessel.

As the parties have stipulated, Trade Arbed contracted to purchase 10,000 metric tons of welded steel pipe and 40,000 metric tons of steel plate from Metalexportimport,

---

1. See Plaintiff's Proposed Findings of Fact, items 20 and 22.

the Rumanian government entity responsible for the sale and export of steel products manufactured in Rumania. Trade Arbed consummated the purchase of the cargo through a German company, Comex S.A., with whom Trade Arbed entered into a joint venture agreement, and Comex was to earn a two per cent commission on the total value of the sale of plate and a one and one half per cent commission on the sale of pipe from Metalexportimport to Trade Arbed.[2]

As further stipulated, Trade Arbed paid $4,241,696.53 for the steel and sold it for $5,430,496.77 to various customers in the United States.[3] Nevertheless, the expenses of shipment, including stevedoring, freight, insurance, duties and customs, reduced the total profit of the joint venture to $22,678.86, and pursuant to the joint venture agreement, Trade Arbed was to receive only two thirds of its profit, or $15,119.24, after the deduction of the Comex commission. The Court agrees with defendants' observation that this was an unprofitable deal.

When the cargo arrived in the United States, various consignees objected to its condition and certain invoice value discounts were accordingly negotiated. Whether those same objections would have been lodged and discounts negotiated under market conditions different from those in existence at the time of delivery of the cargo is a matter for speculation. Nevertheless, the testimony of plaintiffs' own witnesses suggests a "soft" steel market as the problematical background against which this Court must focus upon the cause and extent of damage to the subject cargo and the effect of such damage upon the value of the cargo at the ports of destination.

**2.** The Comex invoices admitted into evidence reflect the price agreed upon by Trade Arbed and Metalexportimport and the percentage commissions on plate and pipe. See Plaintiff's Exhibits 5, 10, 15, 20, 25, 31, 36, 40 & 45.

**3.** See Plaintiff's Exhibits 3, 9, 14, 21, 26, 30, 35, 39, 44, 46 & 51.

## 1. *The Pre-loading Condition of the Cargo*

The plate cargo in question consisted of hot-rolled steel sheets of various thicknesses and dimensions. The pipe cargo consisted of assorted lengths of varying diameters. To transport the cargo to the United States, Trade Arbed, through Comex, engaged another German company, Spedimex Speditionesgesellschaft m.b.H. ("Spedimex"), to charter a suitable ocean-going vessel. Spedimex sub-chartered the M/V SWALLOW for the subject voyage from a Bulgarian company, Bulfracht, which had chartered the vessel from Swallow Shipping.[4]

Trade Arbed's agent, Comex, appointed a supercargo, Dieter Eckle, to attend the cargo loading at Galatz and Constanza, and Trade Arbed concedes that Eckle's attendance afforded it actual notice of the condition of the cargo at the loading ports. Eckle has considerable experience with steel cargos loaded at Rumanian ports, having attended fourteen similar vessels for Comex for similar purposes. Eckle's experience was of such an extent that he could have been qualified as an expert marine surveyor for cargo, but he was not so tendered to the Court.

The Court finds Eckle testified credibly and reliably regarding the pre-shipment condition of the cargo. The Court further finds from Eckle's testimony that the plate cargo loaded in Galatz and the pipe cargo loaded in Constanza were not excessively rusted and were in general good order and condition, in contrast to the appearance and condition of portions of the cargo on outturn.

Specifically, Eckle testified it was his responsibility to ensure that the plate and pipe were loaded in good order and condition aboard the SWALLOW for shipment.

**4.** Swallow filed third party actions against Bulfracht and Spedimex, because Swallow did not want to be estopped from offering evidence of any pre-shipment conditions resulting in cargo erosion, on account of the negotiation of clean bills of lading. However, Trade Arbed does not contend it purchased the cargo in reliance on clean bills of lading, and the third party claims were severed for trial at a later date.

He explained that the port of Galatz, where the plate cargo was loaded, is a fresh water port[5] on the Danube River approximately 100 kilometers from the Black Sea. The plate is milled in Galatz and shipped to the port over a distance of approximately four kilometers on flat bed rail cars. The SWALLOW lifted the cargo in Galatz between February 8, 1985 and March 3, 1985, and Eckle was present in Galatz throughout the time the SWALLOW lifted the subject plate shipments. He inspected the cargo sling by sling as loaded for the times he was on deck. Eckle's testimony established to the Court's satisfaction that the plate loaded aboard the SWALLOW in Galatz was in the same general and acceptable condition as all other plate shipments originating in Galatz. According to Eckle's observations, confirmed by his painstaking review of outturn photographs[6] on the stand to establish the types of rust he observed at Galatz, the plate had oxidized slightly on exposed areas but this oxidation was light and uniform; it was not heavy, blistery or concentrated at isolated areas as it was on portions of the cargo on outturn.

Due to the wintry conditions prevailing in Rumania at that time of year, the stacks of plate stored on the pier were exposed to ice and snow. The Court finds the exposure of shipments of hot-rolled plate to fresh water elements such as ice and snow is routine in Rumania, did not damage the material and produced only surface oxidation of the plate on exposed areas, a condition commonly referred to as atmospheric rust.

The ship's chief officer issued mate's receipts for all of the plate cargo, providing as follows:

All plates before loading were stowed in open air. Plates are partly rusty and loaded in wet condition.[7]

The Court accepts Eckle's testimony that these remarks are commonly noted by chief officers on many types of hot-rolled material and did not denote an exceptional or irregular condition of the material.

The ship was also attended in Galatz by a surveyor, Virgil Naghirnhac, appointed by the vessel owner's Protection and Indemnity Club. This surveyor also inspected the plate in open storage, noting as did Eckle that the stacks of plates were wet and covered with snow and ice. The surveyor reported,[8] concerning the plate on the wharf, that "as far as the rust is concerned, the steel plates were in normal condition, presenting traces of atmospheric oxidation on the edges, part of them on the surfaces and on the part where the steel plates were not one over the other." The surveyor further reported that the plates were "in good condition as external aspect;" that oxidation had begun on the edges of the plate due to "atmospheric humidity," and that portions of the plate surfaces had "superficial rust spots" that could be "removed by wiping with sackcloth." These findings are consistent with Eckle's testimony. In sum, none of the conditions reported by the ship's surveyor or Eckle indicated that the cargo in Galatz was excessively rusted prior to shipment. The ship's surveyor's report furthermore attests that the plate in Galatz was not exposed to chlorides or other corrosive contaminants.

Eckle also attended the loading of the pipe shipments aboard the vessel in Constanza between March 14–26, 1985. The vessel owner's P & I club also appointed a surveyor, M. Constantinescu, to examine the cargo in Constanza, and further information regarding the cargo is reflected in the mate's receipts,[9] some of which show remarks of "partly rusty" and "slightly rusty."

The owner's P & I surveyor reported that the pipe was brought alongside the ship at various times directly from the fac-

---

5. See also Plaintiff's Exhibit 64 (Report of surveyor appointed by vessel's P & I underwriters).

6. The photographs reviewed were a part of Plaintiff's Exhibit 54, 66, 83 and 84, which were admitted into evidence.

7. See Defendants' Exhibit 5.

8. See Plaintiff's Exhibit 64.

9. These were submitted as Defendants' Exhibit 41 after trial, pursuant to a note of evidence.

tory, in rail wagons that "were covered with tarpaulins which appeared to be in good condition." [10] The surveyor also noted that "(a)lthough the weather was somewhat wet in this period the cargo has not been affected," and that the pipe "appeared to be in good condition, clean, without traces (signs) of rust and/or other foreign matters." The surveyor concluded, "All above mentioned point to the conclusion that the cargo loaded was in sound condition and consequently, 'clean bills of lading' could be signed." In sum, none of the bundles of pipe observed by Eckle or the ship's P & I surveyor exhibited any type of advanced corrosion of the type attributable to chlorides or other corrosive agents, and the clausing of the mate's receipts does not establish anything other than the presence of atmospheric oxidation.

Accordingly, the Court also concludes the pipe loaded in Constanza was in good order and condition following the completion of loading and was not exposed to corrosive contaminants prior to shipment.

### 2. The Condition of the Cargo on Outturn in New Haven

The evidence concerning the condition of the cargo at the destination ports is highly conflicting and difficult to reconcile.

The vessel's first port of call was New Haven, where the vessel discharged both plate and pipe shipments commencing April 19, 1985. The plate cargo consigned to New Haven was stowed in the forward section of the no. 1 hatch (391 pieces); the forward section of the no. 3 hatch (366 pieces); and the after section of the no. 4 hatch (818 pieces), above Mobile bound plate.[11] The pipe cargo was top-stowed over the plate cargo in each of the ship's four hatches: 625 bundles in no. 1; 1035 bundles in no. 2; 396 bundles in no. 3; and 485 bundles in no. 4.

The New Haven cargo was to be received by four of Trade Arbed's customers, Primary Steel, United Pipe & Steel Co., Vass Supply Co. and American Steel & Aluminum Co.

Upon the discharge of the cargo at New Haven Marine Terminal, Primary Steel objected to the condition of portions of the material delivered to it, allegedly because of its contact with salt water. Primary's claims related specifically to plate carried under all bills of lading discharged in New Haven from hold no. 1,[12] but to pipe carried under only three of the seven pipe bills of lading in hold no. 1,[13] even though the pipe was stowed over the plate cargo. No claims were made for plate carried in hold no. 2, but there were claims made in respect of four out of six pipe bills of lading.[14] Of the New Haven cargo discharged from hold no. 3, claims were made in respect of two out of five pipe bills of lading and all plate bills of lading.[15] From hold no. 4, claims were made as to three out of four pipe bills of lading and two out of six plate bills of lading.[16]

These claims were allegedly supported by the appearance of the cargo and positive silver nitrate testing obtained by Joe Costello, the terminal manager for Primary Steel.

The main problem encountered by the Court in assessing the New Haven Primary claim was to align the evidence of damage

---

10. See Plaintiff's Exhibit 65.

11. See Plaintiff's Exhibits 58 and 59 (also submitted as Defendants' Exhibits 11 and 21), and graphics submitted in connection with defendants' post trial briefing.

12. This aspect of the claim relates to plate carried under bills of lading 3, 5 through 7, 10 and 15.

13. This aspect of the claim relates to pipe bills of lading 4, 6, and 10. According to plaintiff's proposed findings of fact, no claims are made in this suit in respect of bill of lading 18.

14. Specifically, pipe bill of lading 2, 5, 7, 8 and 20 were involved.

15. Specifically, pipe bills of lading 1, 3, 14, and 15 and plate bills of lading 8, 9, 11, 12 and 13 were involved. According to plaintiff's proposed findings of fact, no claims are made in this suit in respect of bill of lading 19.

16. Specifically, pipe bills of lading 1, 11–13 and plate bills of lading 1, 2, 4, 13–15 were involved.

to the bills of lading as to which claims were made. The proof preponderates that portions of the cargo were damaged by salt water exposure, but survey findings do not consistently relate to the portions of cargo as to which claim was made. In addition, some of the plaintiff's survey findings are either contradicted by laboratory analyses or reported laboratory findings are unsupported by the laboratory reports. An additional difficulty is that plaintiff failed to sustain its burden of proving a loss as to Primary Steel that in any way relates to the fair market value of the cargo, although the Court computed certain losses on the basis of negotiated discounts, there being no other competent evidence of the value of the claims.

Plaintiff. offered proof that in response to Primary's claim, Trade Arbed contacted its underwriter, Talbot, Bird, Inc., who engaged Roger Shields from marine surveyors, Lee–McAndrews, Inc.[17] to inspect the plate while still in storage at the outturn terminal in New Haven on May 9, 1985 and on subsequent dates in Costello's company. Shields also submitted samples of scrapings from the plate to the laboratory of Stillwell & Gladding, Inc., on two separate occasions.[18] The ship's interests in New Haven were represented by surveyor Michael Cooper of American Marine Services, Inc., who testified at trial.[19]

Shields concluded that approximately 54% of the total shipment consisted of heavily oxidized plate attributable to contact with salt water. Specifically, Shields obtained positive reactions from unidentified samples apparently taken from eight inch pipe carried under bill of lading 6, one inch pipe carried under bill of lading 10[20], and pipe bills of lading 1[21], and 2[22], and plate bills of lading 3, 4, 5, 8, 11, 13 (66 pieces) and 15. Shields also states that the Stillwell laboratory reported positive findings on these bills of lading. Shields further reports that he and Stillwell had negative findings as to plate bills of lading 1, 6, 7, 9, 10, 12 and 14.[23] In fact, the Stillwell laboratory reports are conclusory and do not itemize findings as to particular bills of lading.

Cooper confirmed the rusty condition of the cargo, but concluded that the rust was attributable to fresh water condensation. He based this conclusion on predominantly negative silver nitrate tests and his findings after a somewhat cursory examination that the vessel's hatches and tarpaulins were in good condition.[24] Cooper boarded the vessel prior to off-loading and found discernible patterns of heavy wetting on the pipe cargo stowed under the opening of the no. 1 hatch. The pipe cargo underneath the no. 1 hatch was severely corroded, with splash marks evident on the top

---

**17.** See Plaintiff's Exhibits 69, 71, 73, 75 and 80 admitted into evidence upon defendants' withdrawal of their objections to admissibility.

**18.** See Plaintiff's Exhibits 61 and 62. The Court has given no weight to Exhibit 63. See note 21 infra.

**19.** See also Defendants' Exhibits 25–A & 25–B.

**20.** See Plaintiff's Exhibit 75. The bills of lading tested can only be deduced by the process of eliminating those bills of lading as to which no claim was made, as listed on page 2 of this exhibit, which typifies the consistent lack of clarity in the surveys.

**21.** See Plaintiff's Exhibit 73.

**22.** See Plaintiff's Exhibit 71. Plaintiff's Exhibit 80 reports positive salinity tests but does indicate for which of the three bills of lading covered by that report.

**23.** See Plaintiff's Exhibits 61–62 and 69. Defendants vigorously urge that Exhibit 63, refer-

enced to Shields' Reports 913621 9B63, should be disregarded by the Court because it also refers to two inch BPE Pipe, as to which no claim was made. See Plaintiff's Exhibit 16. This reference was apparently deleted from the copy of the report received by Lee–McAndrews. Compare Plaintiff's Exhibit 16 with Plaintiff's Exhibit 63. Plaintiff urges the reference to two inch BPE Pipe was an apparent typographical error. Considering this unexplained discrepancy, the Court has given no weight to Exhibit 63, and no recovery for alleged damage to pipe in hold no. 3.

**24.** Cooper's trial testimony was not entirely without inconsistency due to a contradiction between his testimony on direct and his rough notes: He testified to finding no pitting (such as would be indicative of exposure to corrosives), whereas his original rough notes report pitting. Compare Trial Transcript p. 378 with Plaintiff's Exhibit 91.

tiers of the under-stowed plate. Cooper's silver nitrate testing of the affected pipe yielded part positive reactions, also indicating the presence of sea water. Cooper also noted a similar wetting pattern in the pipe stow underneath the hatch cover in the no. 2 hatch, which he attributed to condensation and on which he reportedly obtained negative silver nitrate reactions. Cooper obtained no positive reactions on silver nitrate testing of the plate cargo at the outturn terminal.

Nevertheless, given the Court's concerns regarding the care with which Cooper evaluated the cargo and the inconsistencies in his testimony, the Court is inclined to give more weight to the plaintiff's survey findings where they conflict with those of the defendants. However, the evidence preponderates that such salt water wetting occurred only where there are test results obtained in the field by Shields and Costello attributable to specific bills of lading. Thus, the minimal proof of salt water exposure does not support the full extent of the New Haven claims.

There remains to be addressed the quantum of damages for the cargo proven to have been damaged by salt water exposure.

After initially rejecting the plate, Primary proposed accepting the plate at a depreciation discount representing 25% of invoice value. See Shields Deposition, p. 81. Shields subsequently induced Primary to accept the material at a 12.5% discount, in the total sum of $105,635.02. He subsequently negotiated depreciation discounts amounting to $11,478.25, based on Trade Arbed/Primary invoice values, for which Primary debited Trade Arbed and for which Trade Arbed was reimbursed by its underwriter.[25]

United accepted a portion at discounts; and the balance was sold by Shields for salvage, resulting in a total net loss of $51,706.07, for which Trade Arbed was also compensated by its underwriters.[26]

25. See Plaintiff's Exhibits 7 and 8.

26. See Plaintiff's Exhibits 17 and 18.

Vass Supply accepted the material at invoice value discounts amounting to $28,501.02 and American Steel accepted the material at invoice value discounts amounting to $41,901.46.[27]

The Court thus finds that plaintiff's damages attributable to rust resulting from chloride exposure of the plate and pipe under specific bills of lading and based on discounts in the prices off Trade Arbed's invoices, were as follows:

| | |
|---|---:|
| Bill of lading 1 (pipe) | $ 11,785.18 |
| Bill of lading 2 (pipe) | 11,478.25 |
| Bill of lading 6 (pipe) | 4,451.32 |
| Bill of lading 10 (pipe) | 17,459.52 |
| Bill of lading 3 (plate) | 2,243.18 |
| Bill of lading 4 (plate) | 8,545.44 |
| Bill of lading 5 (plate) | 11,393.92 |
| Bill of lading 8 (plate) | 15,191.88 |
| Bill of lading 11 (plate) | 12,786.51 |
| Bill of lading 13 (plate) | 3,938.47 |
| Bill of lading 15 (plate) | 949.99 |
| | $100,223.66 |

3. *The Condition of the Cargo on Outturn in Savannah*

After New Haven, the SWALLOW called at Savannah on 29 April 1985 to discharge 1664 pieces of plate shipped under bills of lading Galatz/Savannah 1 through 24 and 315 bundles of pipe shipped under bill of lading Constanza/Savannah 1. The plate was stowed in the forward section of the no. 2 hold (1027 pieces) and in the after section of the no. 3 hold (637 pieces). The pipe was stowed in the after section of the no. 3 hold above plate consigned to Savannah.

Trade Arbed had contracted to sell the plate cargo to Primary Steel and the pipe cargo to Universal Steel and Construction Materials, Inc. Claims were received as to all plate bills of lading and under the only pipe bill of lading discharged in Savannah.

In this connection with these claims, the Court received the deposition testimony of Trade Arbed's surveyors Charles Sullivan, who inspected the plate cargo consigned to Primary, and Charles Williams, who inspected the pipe cargo consigned to Universal, both from Charles T. Theus, Inc. The

27. See Plaintiff's Exhibits 13 and 24.

vessel interests appointed J.C. Healan of L.O. Smith, Inc., as their surveyor in Savannah.

The Savannah claim as to pipe cargo appears well founded and is supported by positive survey findings from both the vessel and the cargo interests.[28] Cargo surveyor Williams inspected the pipe May 7, 1985 at Universal Steel's warehouse in Savannah. Universal had taken exception to apparent salt water rust upon receipt of the cargo. Williams found the pipe with lengths affected by rust to various degrees throughout the bundles. He did not consider the rust evident on the pipe to constitute a pre-shipment condition. He also tested randomly selected pipes with silver nitrate, obtaining positive reactions in all instances, indicating the pipe had been in contact with salt water. He thereafter negotiated with Universal a 20% invoice value discount, yielding an insured loss to Trade Arbed of $21,958.25.

Healan inspected the pipe shipment at Universal's warehouse and the plate consignment in open storage at the Georgia Ports Authority terminal on May 8, 1985. He obtained rust scrapings at each location and submitted the samples to Savannah Laboratories and Environmental Services, Inc. for analysis. The laboratory reported very substantial levels of chlorides in the scrapings from the pipe bills of lading 1 and 2.[29]

The evidence as to the plate cargo is not as definitive. Sullivan inspected the plate on May 6, 1985 in open storage at the Georgia Ports Authority terminal.[30] He observed the plate in stacks with edges heavily corroded at irregular intervals, with heavy scaling and pitting at the areas most severely affected. He obtained "rep-

resentative" samples of the rusted areas and tested the samples in Theus' office laboratory, applying silver nitrate after depositing the rust scrapings in distilled water. Although he obtained positive reactions indicating the presence of chlorides in the samples taken from the areas affected with heavy oxidation and scale, he did not identify the bills of lading or particular lots of cargo tested. Moreover, due to substantially positive reactions, Sullivan felt it was unnecessary to obtain laboratory confirmation. Based on his field observations and the silver nitrate results, Sullivan concluded that approximately 30% of the plate had been in contact with salt water.

The only laboratory results confirming Sullivan's findings were those obtained by Healan from Savannah Laboratories, which test results disclosed barely notable levels of chlorides for plate bills of lading 10, 14 and 18, discharged from hold no. 3, and these results are merely arguably close to the 1000 ppm chlorides levels indicative of salt water exposure.[31]

Plaintiff pointed out to the Court that substantial levels of chloride were found on pipe stowed in the vessel's no. 3 hatch; and that this finding supported plaintiff's claims that chlorides were present as to all bills of lading and all cargo carried in hatch no. 3. Plaintiff also argued that Healan's negative test results as to hold no. 3 plate cargo were unreliable because the ship's surveyor in New Haven, Cooper, had reported no positive reactions as to pipe carried in hold no. 3 under bills of lading 1, 3, 14, 15 and 19 next to Savannah bound pipe testing positive for chlorides by both parties. However, this argument serves to confirm the Court's overall impression of the equivocal nature of plaintiff's proof

---

28. See Plaintiff's Exhibit 56 (Theus Survey; Savannah pipe cargo) and Defendants' Exhibit 26 (L.O. Smith Survey; Savannah plate and pipe cargo).

29. See Plaintiff's Exhibit 68.

30. See Plaintiff's Exhibit 53.

31. See Plaintiff's Exhibit 68. Chemist R.E. Daughdrill, retained by one of plaintiff's customers, explained at trial that the threshold level of chloride content indicating seawater is 1000 milligrams chloride per kilogram of water. Plaintiff argued that 100 ppm is significant for seawater exposure, based upon the deposition testimony of Leonard Maltese. However, in the Court's view, Maltese stated only that 100 ppm may indicate exposure to atmospheric salt or seawater followed by fresh water, which testimony is not conclusive on the issue of threshold chloride content. See Maltese Deposition, pp. 25–27.

regarding the extent of the damage in question. Thus, when called upon to weigh the effect of defendants' proof tending to show cargo covered by a particular bill of lading tested negative for chlorides against the plaintiff's argument, unsupported by test results, that such exposure occurred, this Court has found more reliable the negative test results directly attributable to specific bills of lading.

Discussions between Sullivan and Primary's representatives culminated in Primary's agreement to accept the plate at an overall 17.5% invoice value discount, representing an insured loss to Trade Arbed of $133,407.56. However, as alluded above, the Court is constrained to find that a loss has been proven only as to certain bills of lading, which loss the Court has computed as follows using the negotiated discount off invoice values [32]:

| | |
|---|---|
| Bill of lading 1 (pipe) | $21,956.25 |
| Bill of lading 10 (plate) | 2,326.27 |
| Bill of lading 14 (plate) | 6,380.59 |
| Bill of lading 18 (plate) | 9,570.89 |
| | $40,234.00 |

The assessment of damages with reference to the discounts is supported by the proof that Williams notified the vessel owners of his proposed discount for the pipe damage, subject to the carrier's option to present a better price. See Williams deposition, pp. 33–34. Accordingly, full recovery on the pipe claim is appropriate. By contrast, Sullivan admitted he never invited the vessel interests to review his proposed settlement with the plaintiff's customers. See Sullivan Deposition, pp. 88–89. A further problematic point in connection with the plate claims is the absence of proof of resale or market value of sound cargo. However, the Court finds a limited recovery predicated upon discounts for the cargo carried under specific bills of lading as a reasonable measure of the proven losses.

### 4. The Condition of the Cargo on Outturn in Mobile

After Savannah, the SWALLOW called in Mobile on May 6, 1985 to discharge plate shipped under Galatz/Mobile bills of lading 1, 10, 12 and 13, covering cargo sold by Trade Arbed to Jeffreys Steel. The cargo was stowed in the after section of the no. 2 hatch (848 pieces from bill of lading 13) and in the after section of the no. 4 hatch (345 pieces from bill of lading 13 and 41 pieces covered by bills of lading 1, 10 and 12).

Jeffreys was represented in Mobile by a marine surveyor, Gary Kerr, of Charles L. Hamilton & Company. His deposition testimony was submitted to the Court.[33] Kerr obtained rust scrapings on May 10, 1985, which he submitted to Thompson Engineering Testing, Inc. for analysis. Thompson's analyst, James Sciple, who testified at trial, subsequently concluded that the rust likely resulted from sea water.[34] The Court found Sciple's testimony to be highly credible.

Trade Arbed and its underwriters were represented in Mobile by marine surveyor Anthony Forrest, of Matthews, Matson & Kelley, Inc. The vessel interests were represented by Richard Carmack of CMIS, Inc.

Forrest testified at trial[35] that he examined the material on May 10, 1985, and observed varying conditions, some plates in good order and others with occasional heavy and encrusted rust concentrated on edges. Forrest obtained positive reactions to silver nitrate applications at unidentified areas of heavy and encrusted rust and negative reactions where the rust was only light and atmospheric in appearance.

Forrest obtained unspecified rust scrapings jointly with Carmack on May 21 and submitted them to Analysis Laboratories, Inc., which concluded that the scrapings showed no evidence of contact with sea water.[36] Forrest nonetheless concluded

32. See Plaintiff's Exhibit 35.

33. See also Kerr 1 attached to his deposition.

34. See also Sciple Report, Plaintiff's Exhibit 90.

35. See also Forrest's Report submitted as Plaintiff's Exhibit 89.

36. See Defendants' Exhibit 29. The laboratory report is also attached to Plaintiff's Exhibit 89. Carmack's Report, submitted as Defendants' Exhibit 27, recites the date of survey as May 31. However, the Carmack Report acknowledges receipt of the laboratory report of May 29, so the Court accepts May 21 as the correct date.

that portions of the plate consigned to Jeffreys were in fact corroded due to contact with sea water, the extent and degree of such corrosion not being attributable to atmospheric conditions. Given the delay between outturn and the date the scrapings were obtained, coupled with Sciple's testimony, the Court finds the evidence preponderates that salt water damage occurred to the bills of lading in question.

Forrest and Trade Arbed ultimately failed to induce Jeffreys to accept the material. Accordingly, steps were taken to sell the cargo on the salvage market, and the salvage sale was consummated with the highest bidder, Rudolph Robinson & Company. However, Trade Arbed advanced money to Rudolph Robinson to complete the sale and in return Rudolph Robinson agreed to pay back Trade Arbed from Rudolph Robinson's initial resales of the plates. Thereafter, Rudolph Robinson agreed to pay Trade Arbed 50% of all profits on the sale of the plate. Given the total lack of evidence of an arms length transaction, the Court finds there is no reliable measure of the losses as to the Mobile cargo, and that plaintiff has not proved it sustained a loss based upon the fair market value of the steel in sound condition.

Plaintiff's Mobile claim is further called into question by Forrest's responses to questioning from the Court, that had he negotiated a discount with Jeffreys, it would have been a 5% discount from the Mobile invoice value of $622,000,[37] which would have amounted to a discount in the $35,000 to $40,000 range. Thus, the Court finds that the only reasonable measure of salt water damage is a $35,000 discount in respect of the bills of lading in question.

5. *Condition of the Cargo on Outturn in New Orleans*

The last port of call was New Orleans, where the vessel arrived on May 10, 1985 to discharge plate shipped under Galatz/New Orleans bill of lading 17 and sold by Trade Arbed to Avondale Shipyards,

Inc. The plate shipped under bill of lading 17 was bottom-stowed in each of the vessel's four holds: 652 pieces in the aft section of no. 1; 226 pieces in the aft section of no. 2; 333 pieces in the aft section of no. 3; and 433 pieces in the forward section of no. 4.

Trade Arbed and its underwriters were represented in New Orleans by Matthews, Matson & Kelley, whose surveyor, Peter Clarke, inspected the cargo in stow prior to the commencement of discharge. Clarke testified at trial that he examined the top-stowed plate in the no. 1 hatch and obtained positive silver nitrate reactions; he also found salt water traces in the no. 3 hatch. These findings as to the presence of sea water in holds 1 and 3 were consistent with those of defendants' surveyors, Deep–Sea Marine Surveyors & Consultants, Inc.

On May 15, 1985, Robert Foret, acting for Henry N. Feste & Co., Inc., inspected the plate in Avondale's behalf after the barges reached Avondale's yard. Foret likewise testified at trial that he found substantial quantities of the plate apparently affected by salt water rust, and that he obtained positive silver nitrate reactions throughout the cargo, although he did not indicate from what holds the affected cargo came. Foret submitted samples of corroded areas to Analysis Laboratories, Inc., whose report indicated that ten of the fourteen samples contained significant amounts of the four primary components of sea water.[38] Again, however, no indication was given of the holds in which the cargo in question was carried.

Thereafter, on and after May 23, 1985, Matthews, Matson & Kelley surveyors Clarke and Forrest negotiated with Avondale a reconditioning allowance amounting to $140,000 on account of the salt water rust. Significantly, however, on cross examination of Clarke and Forrest, defendants elicited testimony to the effect that the steel market was soft and that on the open market, Avondale could have purchased this cargo for less than it paid

---

**37.** See Plaintiff's Exhibit 44.

**38.** See Plaintiff's Exhibit 85.

Trade Arbed. This testimony tends to explain why the plaintiff preferred to negotiate discounts with its customers and has not presented this Court with evidence of the fair market value of sound steel. However, it appears the plaintiff was acting in good faith to protect its own economic interests, and even though the testimony from plaintiff's own surveyors calls into question whether plaintiff sustained an actual loss with reference to the fair market value of the New Orleans cargo in sound condition. Thus, the Court is inclined to compute damages on the basis of negotiated discounts for the cargo discharged from holds one and three, where the presence of chlorides is documented, as follows:

| | |
|---|---|
| Hold 1 | $43,233.06 |
| Hold 3 | 30,084.86 |
| | $73,317.92 |

### 6. The Cause of the Loss

As indicated above, the Court finds there is a clear disparity in the pre-shipment condition of the cargo and the condition of some of the cargo on outturn. The Court further finds there is a preponderance of evidence attributing this disparate condition to the damaged cargo's exposure to salt water. The issue remains, how and when did this exposure occur and why did it occur on only parts of the cargo in question.

The evidence affirmatively establishes exposure to seawater while the cargo was in the vessel's holds. First, the vessel's master, Andreas Pramateftakis, testified at trial that prior to loading, the vessel holds were washed with seawater and not rinsed with fresh water. See Trial Transcript ["Tr. Tr."], p. 351. See also Defendants' Exhibit 25. The Captain had no other explanation for entry of seawater. Tr. Tr., p. 355–56.

The Court was further impressed by the Captain's refusal to permit plaintiff's surveyors to photograph the cargo in stow, which photographs would have been the best evidence of cargo condition. In the Court's mind, this creates a clear inference that the vessel had something to hide. See Tr. Tr., pp. 356–59. In addition, photographs submitted as Exhibit 26 show a line of rusting on cargo underneath the hatch, leading to the inference that seawater entered the hold. See photograph No. 25. Other photographs also show puddles of water, leading to an inference that rain washed off some traces of seawater. See Defendants' Exhibit 26, photos 17 & 18.

Upon arrival at New Haven, the master issued a note of protest,[39] reporting that heavy seas had washed the vessel's decks on occasion during the voyage. However, no significant vessel damage was reported and the vessel's bridge log[40] does not support the protest's generalized statement of winds from force seven to ten over several days. Therefore, the evidence does not suggest a peril of the sea as an exonerating cause of the loss.

### Conclusions of Law

Having thus ended the parties' mortal combat with the evidence in this case, the Court must now confront COGSA, the governing law. See 46 U.S.C. App. § 1300 et seq.

The Court has jurisdiction of the subject matter of the suit in admiralty, 28 U.S.C. § 1333, and defendants Swallow Shipping and Triaina Maritime do not dispute personal jurisdiction. The Court also has jurisdiction over the M/V SWALLOW in rem, Swallow Shipping having filed a claim in its behalf. Cactus Pipe & Supply Co. v. M/V MONTMARTRE, 756 F.2d 1103, 1107 (5th Cir.1985). The master issued the subject bills of lading, rendering Swallow Shipping and Triaina Maritime COGSA carriers. See 46 U.S.C. App. § 1301(a).

 A cargo owner such as Trade Arbed establishes a prima facie case of carrier liability by establishing the good order and condition of the cargo at the port of shipment and bad order and condition at the port of destination, after the carrier has discharged and delivered the cargo.

---

**39.** See Defendants' Exhibit 36.

**40.** See Defendants' Exhibit 30 (translation). Force ten winds were reported only on April 17, 1985 at 0400 for about four hours.

*Blasser Bros., Inc. v. N. Pan–Am. Line,* 628 F.2d 376, 381 (5th Cir.1980). A bill of lading is *prima facie* evidence that the carrier received the goods as described therein and creates a rebuttable presumption that the goods were delivered to the carrier in good condition. *Blasser Bros., Inc. v. N. Pan–Am. Line, supra; Associated Metals & Minerals Corp. v. M/V RUPERT DE LARRINAGA,* 581 F.2d 100, 101 (5th Cir.1978); *Horn v. Cia de Navegacion Fruco, S.A.,* 404 F.2d 422, 435 (5th Cir. 1968), *cert. denied,* 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969); *E.T. Barwick Mills, Inc. v. Hellenic Lines, Ltd.,* 331 F.Supp. 161, 164 (S.D.Ga.1971), *aff'd,* 472 F.2d 1406 (5th Cir.1973) (without published opinion).

■ If a cargo owner purchases the cargo in reliance on a clean bill of lading, then a carrier is estopped from offering evidence of the cargo's pre-shipment condition. *Cummins Sales & Serv., Inc. v. London & Overseas Ins. Co.,* 476 F.2d 498, 500–01 (5th Cir.), *cert. denied,* 414 U.S. 1003, 94 S.Ct. 359, 38 L.Ed.2d 239 (1973). However, a shipper is not limited to a clean bill of lading to show the good order and condition of the cargo at the port of shipment. A shipper may establish its *prima facie* case by showing, from the condition of the cargo as delivered or otherwise, that the damage occurred while the cargo was in the carrier's custody, *Caemint Food, Inc. v. Brasileiro,* 647 F.2d 347, 355 (2d Cir.1981), or was caused by the carrier's negligence. *Elia Salzman Tobacco Co. v. S.S. MORMACWIND,* 371 F.2d 537, 539 (2d Cir.1967).

■ In this case, Trade Arbed does not contend that it purchased the cargo in question in reliance on clean bills of lading. As a result, the defendants are not estopped from offering evidence of the pre-shipment condition of the plate in Galatz or the pipe in Constanza. *See Portland Fish Co. v. States S.S. Co.,* 510 F.2d 628, 633 (9th Cir.1974). Trade Arbed has, however, established the good order and condition of the cargo at the loading ports through the testimony of the supercargo, Dieter Eckle, and the reports of the vessel's P & I sur-veyors. Eckle's testimony attesting the actual good order and condition of the cargo at the loading ports is corroborated by the reports of the ship's P & I surveyors that the plate and pipe had only slight rust prior to shipment.

However, evidence of bad order at the ports of discharge preponderates only as to certain bills of lading. In order to find such bad order, this Court would have to find that the losses claimed by Trade Arbed manifestly did not arise out of atmospheric or fresh water conditions existing in Galatz and Constanza, but to the contrary, and convincingly so, developed due to the presence of chlorides not affecting the cargo at the loading ports. Such damage was proved only as to portions of the cargo, as indicated above.

Even if the Court were to conclude that the shipper had presented a *prima facie* case as to all damage, the Court finds the defendants sustained their burden of proving that a discrete, identifiable portion of the cargo was not actually damaged. *Blasser Bros., Inc. v. N. Pan–Am. Line,* 628 F.2d at 382; *J. Gerber & Co. v. S.S. SABINE HOWALDT,* 437 F.2d 580, 588 (2d Cir.1971).

■ As to the damaged portion of the cargo, the defendants have not explained how sea water found its way on the cargo, and the presence of seawater creates a presumption of unseaworthiness. *Wessels v. The ASTURIAS,* 126 F.2d 999, 1001 (2d Cir.1942). Because the defendants have not explained the cargo's exposure to sea water while in the defendants' custody, they are liable for the damage. *See Jefferson Chem. Co. v. M/T GRENA,* 413 F.2d 864, 866 (5th Cir.1969). Thus, the Court rejects defendants' contention that they be exonerated for all damages claimed herein because of the unexplained "selective attack" by saltwater on the cargo in question. Defendants have the burden of offering this explanation.

■ However, the proof offered by the defendants to demonstrate the selective nature of the attack satisfies the defendants' burden of segregating the portion of the

loss caused by their negligence or breach of duty and the portion caused by something for which the carrier is not responsible. *Schnell v. The VALLESCURA*, 293 U.S. 296, 304, 55 S.Ct. 194, 196, 79 L.Ed. 373 (1934); *Vana Trading Co. v. S.S. METTE SKOU*, 556 F.2d 100, 105 (2d Cir.), *cert. denied*, 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977).

An equally difficult legal issue inheres in the measure of damages. Ideally, this Court should assess damages based upon the fair market value of sound cargo less the market value of the cargo in its damaged state. *See Emmco Ins. Co. v. Wallenius Caribbean Line, S.A.*, 492 F.2d 508, 514 (5th Cir.1974). *See also Holden v. S/S KENDALL FISH*, 262 F.Supp. 862, 866 (E.D.La.1966), *aff'd* 395 F.2d 910 (5th Cir. 1968). Citing primarily district court decisions and one unreported Fifth Circuit decision, plaintiff asserts that damages may be properly measured with reference to the invoice prices agreed upon between Trade Arbed and its customers and that such invoice prices adequately reflect fair market value. *See Kukjr Am. Corp. v. M/V SANKO MAPLE*, 782 F.2d 1038, 1986 A.M. C. 2901 (5th Cir.) (per curiam); *Alcan Rubber v. HELLENIC LEADER*, 578 F.2d 1366, 1978 A.M.C. 63, 72 (S.D.N.Y.); *Dixie Plywood Co. v. S.S. FEDERAL LAKES*, 404 F.Supp. 461, 465 (S.D.Ga.), *aff'd* 525 F.2d 691 (5th Cir.1975). Plaintiff further contends that depreciation discounts approved by responsible marine surveyors based on a representative examination of the cargo are likewise accepted as a fair measure of cargo loss, citing *Yeramex Int'l v. S.S. TENDO*, 1977 A.M.C. 1807, 1837 (E.D.Va.), *rev'd other grounds*, 595 F.2d 943, 1979 A.M.C. 1282 (4th Cir.).

■ The proof in this case does not bear out plaintiff's contention that Trade Arbed's invoices adequately reflect fair market value as to all bills of lading: Testimony tending to establish the steel market was soft and that the steel in question, if sound, would have been sold for less at the destination ports than the invoice value, prevents the Court from concluding the Trade Arbed invoices reflect fair market value. Furthermore, defendants' proof cast serious doubt upon the representative nature of the testing performed by the plaintiff so as to support the viability of an across the board discount off invoice value as a proper measure of damages.

However, in light of the Court's findings that defendants are liable for damages sustained by discrete portions of the cargo, the Court is of the opinion that plaintiff is entitled to some compensation and that under the circumstances, an application of the negotiated discounts to the invoice values for particular bills of lading is the only reasonable measure of damages.

■ The Court recognizes that the industry practice of negotiating discounts, as illustrated in this case, assumes that a portion of the cargo covered by the discount is sound. The Court is also of the opinion that the discounts originally negotiated took into account the less than sterling (although technically "sound") general appearance of the cargo, in addition to the appearance of damage due strictly to salt water exposure. Thus, the Court has deemed it necessary to reduce the likelihood of inclusion of sound cargo within the discounted items by limiting plaintiff's recovery to particular bills of lading. Nevertheless, the Court acknowledges the likelihood that some additional cargo may have been damaged. Accordingly, the Court finds it equitable to award as an extra measure of recovery a lodestar factor of ten per cent of the discounts for the particular cargo found by the Court to be salt water damaged. This lodestar factor is intended by the Court as an accommodation between the originally negotiated across the board discounts, which the Court feels are an unfairly high measure of damages in this case, and the Court's calculation of damages by allocating the discount factor only to the invoice prices for particular bills of lading.

In sum, the Court's calculations are as follows:

| | |
|---|---|
| New Haven | $100,223.66 |
| Savannah | 40,234.00 |
| Mobile | 35,000.00 |
| New Orleans | 73,317.92 |
| | $248,775.58 |

Adding the ten per cent lodestar factor of $24,877.56 to the above total yields $273,663.14.

For the foregoing reasons, the Court finds plaintiff is entitled to recover from defendants Swallow Shipping and Triaina Maritime S.A., in personam, and the M/V SWALLOW in rem, the sum of $273,663.14, with interest to run from date of judicial demand. The Clerk of Court is directed to enter partial final judgment accordingly under F.R.C.P. rule 54(b), there being no just reason for delay. Within ten days of the entry of this Order, the parties shall advise the Court whether any further proceedings are necessary in respect of the severed claims, reserving to third party defendants the right to move to dismiss the claims against them within ten days of the entry of this Order.