MARINE OFFICE OF AMERICA
CORP., et al., Plaintiffs,

v.

LILAC MARINE CORPORATION,
et al., Defendants.

No. CIV. 98–2359(GG).

United States District Court,
D. Puerto Rico.

Nov. 13, 2003.

⚷⤳381

Francisco Bruno, Henry O. Freese, Hato Rey, PR, for Plaintiff.

Jorge Blasini, San Juan, PR, for Defendant.

## OPINION AND ORDER

GIERBOLINI–ORTIZ, Senior District Judge.

Pending before this court is the plaintiffs' motion for partial summary judgment

and the defendants' cross motion for summary judgment. (Docket entries # 37, 43, 46, 47, 54 & 59).

## BACKGROUND

This is an action in admiralty and a damaged cargo claim under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1301, *et seq.* filed by Marine Office of America Corporation ("MOAC"), Continental Insurance Company ("Continental") and TradeArbed, Inc. ("TradeArbed"). The claim arises from a shipment of 8,678 bundles of reinforced steel bars ("rebars") sold to Otto Wolff Handelsgesellschaft mbh ("Otto Wolff") by TradeArbed. The cargo was loaded at the port of Odessa, Ukraine, on the vessel M/V Cape Cornwall ("Cape Cornwall"), owned by Lilac Marine Corporation ("Lilac"). The cargo's final destination was San Juan, Puerto Rico. (Docket entry # 1).

As part of the terms of the contract, TradeArbed insured the cargo with a policy issued under its name by co-plaintiffs MOAC and Continental. A cargo inspection performed by Otto Wolff and TradeArbed before taking delivery of the cargo at the port of San Juan revealed that a number of bundles of rebars had been damaged by saltwater while onboard the Cape Cornwall. Subsequently, their surveyors came to an agreement as to the extent of saltwater damages sustained by the rebars. Based on the recommendations of the surveyors, TradeArbed and Otto Wolff agreed that a depreciation allowance of 33% from TradeArbed's invoice price would be made to reflect the extent of the damages sustained. In consideration of this depreciation allowance, Otto Wolff agreed to take delivery of the rebars in their partially damaged condition. The depreciation allowance was subsequently credited by TradeArbed to Otto Wolff. In turn, the price depreciation plus other related expenses, incurred by TradeArbed as a result of the saltwater contamination of the rebars, was paid by MOAC and Continental.

On December 4, 1998, MOAC, Continental and TradeArbed filed the above captioned action against Lilac seeking compensation in the amount of $126,370.14 for the damages and expenses incurred by them as a direct result of the rust damage suffered by the rebars while onboard the Cape Cornwall. (Docket entry # 1). Lilac denies any responsibility. (Docket entries # 12 & 32).

After several procedural events, the plaintiffs filed a motion for partial summary judgment arguing that: (1) they have established a *prima facie* case under COGSA against the defendants for the damaged rebars; (2) the defendants are not entitled to any form of exoneration for the saltwater contamination of the rebars because they failed to provide a seaworthy vessel; and (3) the most appropriate and just measure to compensate the damages caused by the defendants' negligence is the depreciation allowance agreed to between TradeArbed and Otto Wolff. (Docket entry # 37).

The defendants opposed the motion for partial summary judgment and filed a cross motion requesting that the complaint be dismissed because the title to the cargo was, at all relevant times, in the name of the buyer, Otto Wolff, who was compensated by the seller, TradeArbed. The defendants theorize that since Otto Wolff did not cede its subrogation rights to TradeArbed, his insurer was not the real party in interest and could not maintain this action. In addition, the defendants claim that, in the event they are found liable, the damages be set in accordance with diminution of market value formula. (Docket entry # 43). The plaintiffs replied alleging that they are real parties in interest to this litigation and have recoverable damages as a result of the defendants'

negligence because the defendants waived the real party in interest defense by failing to raise it in a timely fashion. The defendants counter the waiver argument by stating that in their answer to the complaint they reserved the right to add affirmative defenses and that they learned during the discovery process that TradeArbed lacked title to the goods. (Docket entry # 54).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See, Rule 56(c) of the Fed.R.Cv.P.; *Sands v. Ridefilm Corp.*, 212 F.3d 657, 660–661 (1st Cir.2000); *Borschow Hosp. & Medical Supplies, Inc. v. Cesar Castillo, Inc.*, 96 F.3d 10, 14 (1st Cir.1996). A genuine issue will exist only if a material conflict in the evidence warrants trial because the disputed fact has the potential of changing the outcome of the suit under the governing law. See, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995); *Martinez v. Colón*, 54 F.3d 980, 983 (1st Cir.1995).

The initial burden of showing "the absence of a genuine issue concerning any material fact" falls on the party moving for summary judgment. See, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir.1997). If said burden is established, then the nonmoving party is required to show that summary judgment is inappropriate.

When considering a motion for summary judgment, the court reviews the record in the light most favorable to the nonmoving party and indulges all inferences favorable to that party. See, *Celotex*, 477 U.S. at 324–25, 106 S.Ct. 2548; *Fernándes v. Costa Bros. Masonry, Inc.*, 199 F.3d 572, 577 (1st Cir.1999); *McCarthy*, 56 F.3d at 315; *Byrd v. Ronayne*, 61 F.3d 1026, 1030 (1st Cir.1995); *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991), *cert. denied by* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). This is so because, the nonmoving party cannot avoid summary judgment by "simply show[ing] there is some metaphysical doubt as to the material facts." See, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 259 (1st Cir.1994). Neither can it rest upon "improbable inferences, and unsupported speculation nor upon mere allegations or denials of his pleading". See, *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 37 (1st Cir. 1995), *cert. denied by* 516 U.S. 1113, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996); *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 10 (1st Cir.1990). On the contrary, to properly oppose a summary judgment motion, the nonmoving party needs to proffer sufficiently competent and probative evidence to how differing versions of the facts justify a trial. See, *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995), *cert. denied by* 515 U.S. 1103, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995); *Milton v. Van Dorn Co.*, 961 F.2d 965, 969 (1st Cir.1992). Nonetheless, summary judgment "admits of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails." *Casas v. Mita*, 42 F.3d 668, 684 (1st Cir.1994).

## UNCONTESTED FACTS

Pursuant to the provisions of Rule 56(d) of the Federal Rules of Civil Procedure, and after having examined the evidence submitted by the parties in their motions, we make the following findings of material facts which are uncontested:

1. This is a cargo claim filed under the COGSA, *supra,* arising from a shipment of 8,678 bundles of rebars loaded at the port of Odessa, Ukraine, on the vessel Cape Cornwall, and discharged at San Juan, Puerto Rico.

2. TradeArbed had an agreement to sell 8,678 bundles of rebars to Otto Wolff under the terms C.I.F. San Juan, Puerto Rico, Duty Paid, including Wharfage and Excise Tax. Based on the terms of the contract, TradeArbed insured the rebars under an open cargo policy issued by MOAC and Continental. This insurance policy was under TradeArbed's name.

3. Pursuant to the terms and conditions of the purchase and sale agreement between TradeArbed and Otto Wolff, any damage claims arising out of fresh water and/or atmospheric rust would not give grounds for rejecting the rebars and would not be accepted by TradeArbed.

4. Eurogal Surveys, Ltd./General Surveys Ltd. ("General Surveys") was hired by Cape Cornwall's insurance company, London Steamship Owner's Mutual Association Limited ("London Steamship"), to conduct a preloading survey of the cargo at the port of Odessa. It stems from the survey that the salinity tests performed on random pieces of cargo proved that the cargo was not in contact with saltwater. Based on this preloading survey the following remarks were included in the Bill of Lading and the Mate's Receipt:

 a. Cargo stored at port open yard unprotected from elements.

 b. Cargo wet before shipment.

 c. Cargo partly rust stained.

 d. Rust on ends.

 e. 3% of Bundles: Bundle pieces projecting on ends-some pieces bent.

 f. 1% of Bundles: Some bundle pieces bent along entire length.

 g. Several bundles: Wire strap torn/missing.

5. The Cape Cornwall made stops in a number of discharge ports in the U.S. Mainland to unload part of the steel cargo carried onboard the vessel. London Steamship hired National Marine Consultants ("National Marine") to perform survey inspections at discharge ports to protect the owner's interest concerning allegations of seawater damage to the steel cargo carried onboard the Cape Cornwall. Upon the Cape Cornwall's arrival at the discharge ports of Gloucester City, New Jersey on February 3, 1998 and of Baltimore, Maryland on February 6, 1998, survey inspections were performed finding that a number of rebars showed signs consistent with seawater ingress through the hatch covers due to faulty rubber gaskets.

6. During February 6, 8 and 11, 1998, survey inspections were performed on the cargo onboard the Cape Cornwall while discharging in Baltimore, Maryland. These were made by Luard & Company on behalf of the charterers of the vessel. According to the report, all the holds showed signs of seawater entry which evidenced a pattern of poor housekeeping, affecting the watertight integrity of the Cape Cornwall's cargo holds.

7. Upon arrival at the discharge port of Georgetown, South Carolina on February 11, 1998, another survey report was performed on the cargo of rebars showing heavy orange rust with strong positive reaction to chlorides consistent with seawater ingress through the hatch covers due to faulty rubber gaskets.

8. When the cargo finally arrived in San Juan, Puerto Rico on February 21, 1998, Otto Wolff sent Pasquale Catanzaro, a marine surveyor, to inspect the cargo. TradeArbed also hired its own marine surveyor, Captain Gregory Yoos, to perform an inspection of the rebars. They found that approximately 1,095.23mt of rebars had suffered some degree of rust damage due to saltwater ingress into the cargo holds. According to their reports, the saltwater water damage was caused by worn out and/or deteriorated gasket channels of the vessel which allowed saltwater ingress through the hatch covers.

9. Amado Cordero, the surveyor representing the vessel's P & I interest, was contacted by counsel Blasini[1] before the ship's arrival at the San Juan Port to conduct an inspection of the Cape Cornwall. Though he arrived at the ship the same day that it docked, he confronted problems with the ship's captain who at first denied him permission to board the same. The following day he was able to board the vessel but the San Juan cargo had practically already been unloaded. He never inspected the cargo after it was discharged. He was only able to examine onboard the vessel cargo hold No. 7 where he found that approximately 250 bundles of forty footer rebars were extremely rusted and contaminated with saltwater.

10. The defendants were not represented in the joint survey made between Catanzaro and Yoos because Cordero declined the invitation made by Yoos to attend the same.

11. In an effort to mitigate damages TradeArbed offered Otto Wolff to buy the damaged rebars at a price discount. Otto Wolff agreed and accepted delivery of the damaged rebars at a 33% depreciation from the invoice price. Accordingly, TradeArbed credited Otto Wolff $121,693.15 due to the damages sustained by the rebars.

12. In turn, TradeArbed presented to MOAC and Continental a claim for $126,370.14 as a result of the damages sustained by the rebars due to saltwater contamination. This amount included Otto Wolff's credit plus freight allowance, Otto Wolff's surveyor fees and TradeArbed's surveyor fees.

13. MOAC and Continental reimbursed TradeArbed $124,995.14 for the claim presented. They paid the entire claim except $1,375.00 that corresponded to Otto Wolff's surveyor fees.

## REAL PARTY IN INTEREST AND WAIVER

The defendants allege that the plaintiffs do not have a valid cause of action against them because they are not the real party in interest. The defendants base this allegation on the theory that since the contract between TradeArbed and Otto Wolff was C.I.F. (Cost, Insurance and Freight)[2], both the risk and the title to the goods were transferred to Otto Wolff at the port of loading. Since, TradeArbed did not have title to the goods it could not validly submit a claim to MOAC and Continental (the insurance companies) for the damages to the cargo. *Ergo*, that MOAC and Continental cannot claim, in subrogation, the right of TradeArbed who was not the titleholder nor owner of the cargo here in question. In response, the plaintiffs argue that the defendants raised

---

1. Jorge Blasini, Esq. is the legal representative in this case of the defendants.

2. The term C.I.F. (Cost, Insurance, Freight) is generally defined as a sales price that includes the cost of the marine insurance as well as the transportation, at buyer's risk, to the named port of destination. See, Thomas J. Schoenbaum, *Admiralty and Maritime Law*, Practitioner Treatise Series, Volume 2, 3rd Ed., West Group, St. Paul, MN, 2001, p. 3.

this defense in an untimely fashion, thus, that they waived the same. Specifically, the plaintiffs argue that defendants waited until the eleventh hour, almost two (2) years since the filing of its answer to the complaint [3] and eight (8) months after the scheduled bench trial date [4], to raise the defense that the plaintiffs were not real parties with interest in this litigation. The defendants counter alleging that in the answer to the complaint they reserved the right to amend or add additional affirmative defenses as discovery proceedings developed and that it was precisely during the discovery process that they found out the facts giving support to the defense of real party in interest.

██ An objection on real party in interest grounds should be raised with reasonable promptness. If it is not raised in a timely or seasonable fashion, the general rule is that the objection is deemed waived. See, 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *supra*, § 1554 at 407; *Allegheny Intern. v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1431 (3rd Cir.1994); *Sun Refining v. Goldstein Oil*, 801 F.2d 343, 345 (8th Cir. 1986); *Harris v. Illinois–California Exp., Inc.*, 687 F.2d 1361, 1373 (10th Cir.1982). This is so because, failure to plead affirmative defenses in the answer to the complaint may result in waiver of the defense and its exclusion from the case. See, Rule 8(c) of the Federal Rules of Civil Procedure. It is hornbook law that a defendant has a duty to give the opposing party notice of it's affirmative defenses and a chance to develop evidence and offer arguments to controvert them. See, *Wolf v. Reliance Std. Life Ins. Co.*, 71 F.3d 444, 449–450 (1st Cir.1995); *Conjugal Partnership v. Conjugal Partnership*, 22 F.3d 391, 400 (1st Cir.1994); *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 15 F.3d 1222, 1226 (1st Cir.1994). This duty stems from Rule 8(c)'s core purpose to act as a safeguard against surprise and unfair prejudice. See, *Wolf v. Reliance*, 71 F.3d at 450. Nonetheless, the waiver rule should not be applied automatically. The substance of certain unpleaded affirmative defenses may be asserted at a later stage of the proceedings if there is no prejudice to the opposing party, the defense was raised at a pragmatically sufficient time or when justice so requires. See, 5 Charles Alan Wright, Arthur R. Miller & Mary Kay, *Federal Practice and Procedure*, § 1278, (2nd Ed.1990), pp. 491 & 494; *Conjugal Partnership v. Conjugal Partnership*, 22 F.3d at 400.

██ In the case at bar, the only party properly identified in the bill of lading is TradeArbed as the shipper of the cargo. However, the consignee is named as "To the Order". Moreover, the bill of lading does not contain the terms of the sales contract (C.I.F.) between Otto Wolff and TradeArbed.[5] Likewise, the complaint makes no mention of either the terms of the contract and/or Otto Wolff/Ferromontan. On the contrary, the complaint identifies TradeArbed as "the **owner** for value, **shipper, consignee** and **person in interest** in the shipment of the cargo." (Our emphasis). See, Complaint, p. 4 (Docket entry # 1). In addition, "it is stated in the complaint that the insurance companies

---

3. September 29, 1999.

4. October 31, 2000.

5. A bill of lading, also known as a waybill, "is a receipt given by the master of a ship acknowledging that the goods specified in the bill have been put on board" and "is the document [that] contains the terms of the contract for the carriage of the goods agreed upon between the shipper of the goods and the shipowner." William R. Anson, *Principles of the Law of Contract 380* (Arthur L. Corbin ed., 3d Am. ed.1919), quoted in Black's Law Dictionary 159 (7th ed.1999).

appearing as plaintiffs, namely MOAC and Continental, paid to the owners and/or holders of interests of [the] shipment for the loss caused, and have thus subrogated in their rights . . .". *Id.* at p. 13. In view of the above, there is nothing in the record to contradict the defendants' assertion that it was not until the discovery process, specifically the answer to Lilac's First Set of Interrogatories [6], that they first became aware of the facts giving rise to the real party in interest defense and were in a position to properly raise the same.

On the other hand, during the discovery process the parties encountered multiple problems that generated changes in the Initial Scheduling Order. For instance, new discovery deadlines and dates for the Pre–Trial Conference were scheduled. However, no new dates were set for the filing of dispositive motions. (Docket entries #19, 21–23, 25 & 30). It was in the Proposed Pre–Trial Order where, for the first time, the defendants asserted the grounds for the real party in interest defense which several months later they amplified in the opposition to the partial motion for summary judgment. (Docket entry #33). Though it is uncontested that the Proposed Pre–Trial Order was filed one day before the scheduled Pre–Trial Conference and twenty-six (26) days before the scheduled Trial, the fact remains that both events were set aside *sine die.* (Docket entry #34). More to the plaintiffs' demise, they have failed to establish how they have been prejudiced by the defendants' assertion of the real party in interest defense at the procedural stage in which it was raised. By asserting the grounds of the defense in the Proposed Pre–Trial Order, the defendants put the plaintiffs on notice of the same eight (8) months before they requested the court to act on it by seeking the dismissal of the action pursuant to Rule 17(a), *supra.* In short, we find that the plaintiffs had notice of the defendants' concern on this matter and had plenty of time to prepare to defend themselves. Thus, the plaintiffs' argument that the defendants waited until the eleventh hour is without merit.

Now let us address the argument that the plaintiffs do not have a cause of action because they did not have title to the goods and therefore could not sue the carrier. The defendants contend that the plaintiffs cannot claim in subrogation rights that its assured did not have. As previously discussed, the claimant must be the real party in interest. The purpose of Rule 17(a) [7] of Federal Rules of Civil Procedure is to require that actions be prosecuted in the name of the real party in interest so that the carrier may know against whom he must defend himself and be protected against a subsequent action by another party. See, *Prevor–Mayorsohn Caribbean, Inc. v. Puerto Rico Marine Management, Inc.,* 620 F.2d 1, 4 (1st Cir.1980).

■■ The general rule under an ordinary C.I.F. contract is that the seller/shipper's title to the goods may be transferred to the buyer/consignee upon delivery to the carrier at the port of loading. See, D.M. Day, *The Law of International Trade,* 4 (1981). See also, *Kumar Corp. v. Nopal Lines, Ltd.,* 462 So.2d 1178, 1183 (Fla.App. 3 Dist.1985) *petition for review*

---

6. The interrogatory was answered by the plaintiffs on March 23, 2000. See, Defendants' Reply to the Plaintiffs' Opposition to the Defendants' Cross Motion for Summary Judgment, Exhibit #1, docket entry #54.

7. Federal Rules of Civil Procedure 17(a), in its pertinent part provides that every action shall be prosecuted in the name of the real party in interest. See, *Prevor–Mayorsohn Caribbean, Inc. v. Puerto Rico Marine Management, Inc., supra.*

*denied by S.E.L. Maduro (Florida), Inc. v. Kumar Corp.*, 476 So.2d 675 (Fla.1985). As a result of said title transfer the consignee/buyer is ordinarily the party entitled to sue the carrier in case of any damage. However, the seller/shipper may also sue the carrier: (1) when he acts as the consignee's representative, if said action is ratified by the latter; (2) when the shipper acted as the buyer/consignee's agent in replacing and repairing the damaged cargo; or (3) when the goods are rejected by the buyer and the seller accepts that rejection. See, William Tetley, *Marine Cargo Claims*, 3rd ed., BLAIS, Canada, 1988, p. 192; *Prevor–Mayorsohn Caribbean, Inc. v. Puerto Rico Marine Management, Inc.*, 620 F.2d at 4. See also, *Armco Intern. Corp. v. Rederi A/B Disa*, 151 F.2d 5, 9 (2nd Cir.1945); *Transmarine Corp. v. Levitt*, 25 F.2d 275, 278 (2nd Cir.1928). It is the third situation above mentioned the one that confers TradeArbed, *ergo* MOAC and Continental in subrogation, the right to sue in this case.

■ It stems from the record that after delivery and the surveyors' findings that the cargo in question had been contaminated with saltwater, TradeArbed and Otto Wolff engaged in negotiation efforts regarding the damaged cargo. Pursuant to the terms of the sales contract, Otto Wolff was contractually entitled to reject delivery of the damaged rebars.[8] TradeArbed, in its efforts to mitigate damages, considered retaining the goods and selling them at salvage. However, since the rebar market was glutted[9], it would have been impossible to achieve in open bidding a re-turn at salvage of 67%. Faced with that, TradeArbed followed its surveyor's recommendation that it was better to offer Otto Wolff a 33% depreciation allowance off from the invoice price. See, Letter of March 25, 1998, Motion for Partial Summary Judgment, Exhibit # 18, *supra*. The offer was eventually accepted by Otto Wolff.

In view of all of the above, we find that since Otto Wolff accepted the offer of a deduction allowance for the loss, TradeArbed assumed the loss and consequently, became vested with the right to sue Lilac, the carrier. Likewise, MOAC and Continental, by reimbursing TradeArbed for its loss, became as well parties in interest to this litigation.

### *PRIMA FACIE* CASE UNDER COGSA

■ In order to establish the carrier's liability for loss or damage to cargo under COGSA, the claimant must first establish a *prima facie* case to demonstrate that the goods were damaged while in the custody of the carrier. See, *EAC Timberlane v. Pisces, Ltd.*, 745 F.2d 715, 719 (1st Cir. 1984). In this case, the plaintiffs must establish that: (1) the rebars were delivered to the carrier in good condition; and (2) they were discharged in damaged condition. See, Thomas J. Schoenbaum, *Admiralty and Maritime Law*, Practitioner Treatise Series, Vol. II, Chapter 10, § 10–22, 3rd Ed., West Group, 2001, p. 106. See, *Greenburg v. P.R. Maritime Shipping Authority*, 835 F.2d 932, 934 (1st Cir.1987); *EAC Timberlane v. Pisces, Ltd.*, 745 F.2d at 719.

---

**8.** Under the sales contract, the parties agreed that the only type of rust damage that would not serve as grounds for rejection of the cargo by the buyer was fresh water/sweet water atmospheric rust because the same was not considered detrimental to the overall use and condition of the cargo and, hence, was not covered by any maritime insurance policy. See, Contract of Sales, Exhibit # 4, Motion for Partial Summary Judgment, docket entry # 37.

**9. Glutted:** to flood (the business market) with goods so the supply exceeds demand. *Webster's Third New International Dictionary*, G. & C. Merriam Company, Springfield, MA, 1976.

Under COGSA, the bill of lading constitutes *prima facie* evidence that the carrier received the goods therein described. A bill of lading that details the goods transported and their condition with no notations of damage is a "clean bill of lading". Such a bill of lading may be ordinarily relied upon to establish the shipper's *prima facie* case as evidence of what was turned over to the carrier. See, *EAC Timberlane v. Pisces, Ltd.*, 745 F.2d at 719; *Florencio Roman, Inc. v. CTMT, Inc.*, 614 F.2d 9, 10 (1st Cir.1980); *Cigna Ins. Co. of Puerto Rico v. M/V Skanderborg*, 897 F.Supp. 659 (D.Puerto Rico 1995).

However, the shipper is not limited to a clean bill of lading to show good order and condition of cargo at port of shipment. It can also establish a *prima facie* case by showing, from condition of cargo as delivered or otherwise, that the damage occurred while the cargo was in the carrier's custody or was caused by the carrier's negligence. See, *Trade Arbed, Inc. v. M/V Swallow*, 688 F.Supp. 1095, 1106 (E.D.La. 1988). This requires proof that the cargo was in damaged condition on delivery or discharge. The shipper must introduce credible evidence of the extent of the damage on delivery of the goods. See, *Greenburg v. Puerto Rico Maritime Shipping Authority*, 835 F.2d at 934. The establishment of the *prima facie* case is also affected by section 3(6) of COGSA, 46 U.S.C. § 1303(6), which provides in relevant part that:

> Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be *prima facie* evidence of the delivery by the carrier of the goods as described in the bill of lading.... The notice in writing need not to be given if the state of the goods has at the time of their receipt been subject of joint survey or inspection.

The bill of lading in this case included notations that the cargo had been stored at the port in open yard unprotected from the elements, it was wet before shipment, was partly rust stained, had rust on the ends and some bundle pieces were bent. See, Bill of Lading, Exhibit # 1, Motion for Partial Summary Judgment, *supra*. The defendants argue that these notations contradict the fact that the steel was in good condition. We disagree.

First of all, such standardized notations refer to nondamaging, atmospheric rust that does not affect the value of steel and it is still considered to be in "prime" condition. See, *Thyssen, Inc. v. S/S Eurounity*, 21 F.3d 533, 538 (2nd Cir.1994). Second, the survey performed by General Surveys prior to loading also establishes that the cargo was wet due to recent rains and that the salinity tests performed on random pieces of cargo showed that it was not in contact with saltwater. See, General Surveys, Ltd. Survey Report, Exhibit # 3, Motion for Partial Summary Judgment, *supra*. The record is devoid of any evidence that controverts TradeArbed's claim that the notations on the bill of lading indicate anything other than the sound condition of the steel upon loading. In sum, it is uncontested that the cargo was handed to the carrier in good condition.

As for the second prong of the *prima facie* case, when the Cape Cornwall arrived at San Juan, Puerto Rico on February 21, 1998, Otto Wolf sent Mr. Catanzaro to inspect the cargo prior to taking delivery. Mr. Cantanzaro found that approximately 1,095.23m/t of the rebars had suffered some degree of rust damage due to saltwater ingress into the cargo holds. According to his report, the saltwater

damage was caused by faulty hatch covers and worn out and/or deteriorated gasket channels allowing for water ingress through the hatch covers. See, Pasquale Catanzaro's Survey Report, Exhibit # 11, Motion for Partial Summary Judgment, *supra*. TradeArbed's surveyor, Capt. Yoos also performed an inspection of the rebars wherein he reached the same conclusion as Mr. Catanzaro regarding the amount of rebars that had suffered saltwater rust damage. See, Capt. Yoos' Survey Report and Letter of April 13, 1998 to Hank Benima, TradeArbed's Claims Manager, Exhibits # 12 & 13, *supra*. In addition, the ship's surveyor stated in his report that cargo in Hold No. 7 had been contaminated with saltwater. See, Consultation of Cargo Loss by Captain Paul W. Simpson, Exhibit C, Memorandum of Law on the Measure of Damages Utilizing Fair Market Value, docket entry # 32.

 Since the bill of lading indicates that the rebars were in good condition prior to the voyage, and the joint surveys performed before taking delivery of the rebars show that the steel was in a damaged condition at out turn, the plaintiffs have established *a prima facie* case. Accordingly, the plaintiffs now do not have to produce evidence of fault of the carrier nor provide an explanation of why the goods were damaged. See, *EAC Timberlane v. Pisces, Ltd.*, 745 F.2d at 719; See also, *M. Golodetz Export Corp. v. S/S Lake Anja*, 751 F.2d 1103 (2d Cir.1985) *certiorari denied by S/S "Lake Anja" v. M. Golodetz Export Corp.*, 471 U.S. 1117, 105 S.Ct. 2361, 86 L.Ed.2d 261 (1985); *Nissho–Iwai Co., Ltd. v. M/T Stolt Lion*, 719 F.2d 34 (2d Cir.1983), *on remand* 1984 WL 365 (S.D.N.Y.1984). This is so because, under

COGSA, if the shipper proves a *prima facie* case and there is evidence of unseaworthiness, the burden of proof shifts to the carrier to show either: (1) the exercise of due diligence on his part, that is, the absence of causation; or (2) that the harm was caused by one of the excepted causes listed in § 1304(2) of COGSA [10]. If the carrier cannot show one of these two factors, it will be held liable.

## DUTY TO PROVIDE A SEAWORTHY VESSEL

Section 3(1) of COGSA, 46 U.S.C. § 1303(1), provides that the carrier should be bound before and at the beginning of the voyage to exercise due diligence to: (a) make the ship seaworthy; (b) properly man, equip, and supply the ship; and (c) make the holds, and all other parts of the ship in which the goods are carried, fit and safe for their reception, carriage and preservation. On the same vein, Section 4(1) of COGSA, 46 U.S.C. § 1304(1), establishes that neither the carrier nor the ship is liable for loss or damage resulting from unseaworthiness unless caused by want of due diligence on part of the carrier to make the ship seaworthy. Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section.

 Seaworthiness may be defined as the state of a vessel in such a condition, with such equipment, and manned by such a master and crew, that normally the cargo will be loaded, carried, cared for and discharged properly and safely on the contemplated voyage. Examples of seawor-

---

**10.** Section 1304(2) provides that neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from, among others, an act of omission of the shipper or owner of the goods, his agent or repre- sentative or any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier.

thiness are: (1) a tight hull and hatches; (2) a proper system of pumps, valves and boilers; and (3) engines, generators and refrigeration equipment operating in good order. Faulty or damaged hatches are a constant source of damage to cargo, *ergo*, a constant source of litigation. Hatches should be tight, if there is to be seaworthiness. See, William Tetley, *supra*, at p. 381–388; See also, *Sears, Roebuck & Co. v. American President Lines*, 345 F.Supp. 395 (D.C.Cal.1971).

 The legal test for seaworthiness is whether the vessel is reasonably fit to carry the cargo which it has undertaken to transport. Obviously, a test of such generality can be applied only on a case by case basis, considering the particular and relevant facts of the situation at hand. See, *The Silvia*, 171 U.S. 462, 464, 19 S.Ct. 7, 43 L.Ed. 241 (1898). The duty to provide a seaworthy vessel at the beginning of the voyage is nondelegable, and the carrier is accordingly responsible for the acts of third persons. See, *International Nav. Co. v. Farr & Bailey Mfg. Co.*, 181 U.S. 218, 226, 21 S.Ct. 591, 45 L.Ed. 830 (1901). The inquiry of whether due diligence has been exercised once an unseaworthy condition has been found is a question of fact to be determined by the evidence presented. See, *Martin v. Southwark*, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65 (1903).

 The plaintiffs presented the survey inspections performed at different discharge ports prior to the vessels arrival at Puerto Rico which showed that the saltwater contamination of the steel cargo was consistent with seawater ingress into the cargo holds due to faulty hatch covers and worn out and/or deteriorated rubber gasket channels. See, Surveys, Exhibits # 6–12, Motion for Summary Judgment, *supra*. This evidence has not been disputed by the defendants. See, Defendants' Answer to Plaintiffs' Statement of Uncontroverted Facts, ¶¶ 8–15, docket entry # 43. More-

over, as previously discussed, faulty hatch covers and worn out and/or deteriorated gasket channels make the Cape Cornwall unseaworthy. Therefore, we find that the defendants have failed to comply with their duty to provide a seaworthy vessel. In sum, the plaintiffs' motion for partial summary judgment as to the issues of a *prima facie* case and unseaworthiness must be and is hereby **GRANTED.** Thus, the burden of proof has now been shifted to Lilac to establish the exercise of due diligence or that the damaged to the cargo was caused by one of the excepted causes listed in Section 1304(2) of COGSA.

## METHOD OF COMPUTATION OF DAMAGES

The plaintiffs allege that the depreciation allowance agreed to between TradeArbed and Otto Wolff as to the damaged rebars is the most appropriate and just measure to compensate the damages resulting from the defendants' negligence. In contrast, the defendants oppose arguing that the appropriate measure of damages is the market value formula because the plaintiffs' position is based merely on a visual inspection with no scientific or commercial methodology.

 The purpose behind COGSA's damage recovery scheme is to make the injured party whole by properly compensating for the loss suffered. See, *Santiago v. Sea–Land Service, Inc.*, 366 F.Supp. 1309, 1318 (D.P.R.1973). COGSA provides that "in no event will the carrier be liable for more than the amount of damage actually sustained". 46 U.S.C. § 1304(5); *Thyssen, Inc. v. S/S Eurounity*, 21 F.3d at 540. Generally, the measure of damages is the difference between the fair market value of the goods at their destination in the condition in which they should have arrived and the fair market value in the condition in which they actually did arrive.

See, *Ansaldo San Giorgio I v. Rheinstrom Brothers,* 294 U.S. 494, 496, 55 S.Ct. 483, 79 L.Ed. 1016 (1935); *Illinois Central Railroad v. Crail,* 281 U.S. 57, 64–65, 50 S.Ct. 180, 74 L.Ed. 699 (1930). This rule is known as "Arrived Sound Market Value less Arrived Damaged Market Value" and is based on the assumption that the parties to a contract of carriage know or are expected to know that, if the cargo is damaged or lost, the claimant should be compensated for the value of the damaged or lost cargo at the time and place of the delivery or when it should have been delivered. See, Gilmore & Black, *The Law of Admiralty,* 182 (1975); *St. Johns N.F. Shipping Corp. v. S.A. Companhia,* 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201 (1923).

Under the market value formula, proof of market value and damages may be accomplished by using published price quotations or comparable sales, where available. See, William Tetley, *supra,* at 323. "Arrived Sound Market Value" is difficult to calculate unless there is a market with published listings at the place of discharge. At times, courts have made the calculations of "Sound Market Value less Damaged Market Value" by deciding by what percentage representative samples of the cargo have depreciated and then applying that percentage to the Arrived Sound Market Value. See, *Santiago v. Sea–Land Service, Inc., supra.* Courts have also used invoice prices as the value of the undamaged goods when the fair market value is uncertain or is not proven. See, *Insurance Co. of North America v. M/V Frio Brazil,* 729 F.Supp. 826, 836 (M.D.Fla.1990).

■ Notwithstanding the above, the market value formula is not the only measure of damages that may be applied in maritime cargo claims to ascertain the loss that may be recovered. See, *Hector Martinez & Co. v. Southern Pacific Transp.,* 606 F.2d 106, 110 (5th Cir.), reh. denied,

609 F.2d 1008 (1979), *cert.* denied, 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980); *Bosung Industrial Co. v. M.V. Aegis Sonic,* 590 F.Supp. 908, 914 (S.D.N.Y.1984); *Dixie Plywood Company v. S.S. Federal Lakes,* 404 F.Supp. 461, 465 (S.D.Ga.) *aff'd.* 525 F.2d 691 (5th Cir.1975), *cert.* denied 425 U.S. 974, 96 S.Ct. 2174, 48 L.Ed.2d 798 (1976). Though it is commonly utilized in assessing damages, it is only **one method** and **not the exclusive measure of damages** in cargo cases. See, *Affiliated Foods, Inc. v. Puerto Rico Marine Management, Inc.,* 645 F.Supp. 838, 840. In other words, it need not be applied if circumstances suggest a more appropriate alternative. See, *Illinois Central Railroad v. Crail,* 281 U.S. at 64–65, 50 S.Ct. 180 ("The test of market value is at best but a convenient means of getting at the loss suffered. It may be discarded and other more accurate means resorted to if, for special reasons, it is not exact or otherwise not applicable."); *Thyssen, Inc. v. S/S Eurounity, supra; U.S. v. Palmer & Parker Co.,* 61 F.2d 455, 459 (1st Cir.1932) ("the market value rule is inapplicable when, on the facts, it is not the nearest practicable approach to an ascertainment of the actual loss. Each case must be governed by its own facts."); *Great Atlantic & Pac. Tea Co. v. Atchison, T. & S.F. Ry. Co.,* 333 F.2d 705, 708 (7th Cir.1964) *cert.* den. 379 U.S. 967, 85 S.Ct. 661, 13 L.Ed.2d 560 (1965) ("the rule is not applied in cases where it is demonstrated that another rule will better compute actual damages").

In fact, the assessment of damages in particular situations has called for the development of lesser rules, the use of common sense and the creation of exceptions, all to the end that the shipper whose property has been affected be made whole. See, *Santiago v. Sea–Land, supra.* After all, there is only one rule of universal application, and that is to give compensa-

tion for the loss suffered. See, *U.S. v. Palmer & Parker Co., supra; Héctor Martínez and Co. v. Southern Pacific Transportation Co.,* 606 F.2d 106, 111 (5th Cir. 1979) *cert.* den. 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980); *Dutch Enterprises, Inc. v. Consol. Freightways, Inc.,* 1994 WL 835069 (N.D.Cal., 1994).

▮ In this case, the plaintiffs' computation of damages is based on the findings and conclusions reached by TradeArbed and Otto Wolff's surveyors in their joint survey. During their survey they found that out of the 1,095.23 m/t of rebars that had been in contact with saltwater, 33% would have zero value. Accordingly, TradeArbed gave Otto Wolff a discount allowance on the invoice price that reflected said loss.[11] Based on that formula, TradeArbed reached the sum claimed to, and basically paid by, MOAC and Continental.[12] See, Plaintiffs' Memorandum of Law on Proper Method for Computing Damages and Memorandum of Law on the Measure of Damages Utilizing Fair Market Value, docket entries # 31 & 32.

In contrast, the defendants' base their attack at the plaintiffs' computation of damages on Capt. Paul W. Simpson's expert report, where he calculated the damages in approximately $30,000.00. He indicates that the proper method of computing the damages in this case is by way of the difference between the fair market value at the port of destination less the fair market value of the cargo in its damaged condition. Capt. Simpson's

report is flawed because his calculation is not based on real market values, namely, published price quotations or comparable sales and is grounded on certain presumptions that have no basis on the record. First of all, Capt. Simpson admitted in his deposition that he did not make an independent investigation to obtain the fair market value of the good cargo here in question. Likewise, he admitted that he has no idea of the market value for damaged rebars in San Juan, Puerto Rico for the months during which the sales of the cargo took place. See, Deposition Testimony, Exhibit # 14, pp. 24, 80, Motion for Partial Summary Judgment, docket entry # 37.

However, without any knowledge or reasonable indication of whether the San Juan market value for rebars was uncertain, Capt. Simpson simply resorted to Ferromontan's[13] sale invoices of the cargo to arrive at the values used in his damages formula. See, Expert's Report, Exhibit C, p. 5, Defendants' Memorandum on the Proper Method to Compute Damages, docket entry # 32. That is, he assumed that the sales invoices at below the purchasing price represented the sale of damaged cargo. Hence, that the damaged material was sold at $14.70 and that good material was sold at $15.67. From there he inferred that the difference between both invoice sales prices multiplied by the cargo sold at a discounted price was the real damage suffered by the plaintiffs.[14] *Id.* at p. 6. Based on this and the fact that

---

**11.** Calculations to determine total loss:

1,095.23 m/t—rebars in contact with saltwater
 x 33%—loss of value, discount allowance
 361.43 m/t—rebars with zero value
 361.43 m/t = 7,968.09 cwt
 7,968.09 cwt
 x $15.24—contracted invoice price
$121,433.69
 637.45—freight allowance (.08 cwt)
 1,375.00—survey fees Otto Wolff
 + 2,924.00—survey fees TradeArbed

$126,370.14—total loss claimed to insurers

**12.** MOAC and Continental paid $124,995.14, which was the damages claimed minus Otto Wolff surveyor's fees ($1,375.00).

**13.** Ferromontan is a subsidiary of Otto Wolff operating in San Juan, Puerto Rico.

**14.** $15.67 − 14.70 = .97
 1,391.62 m/tons = 30,679.65 cwt × .97 = $29,759.26

all the cargo was sold contrary to what was first envisioned of one third no value cargo, he asserts that TradeArbed presented an inflated claim loss of great proportions. *Id.* at p. 5.

Though invoice prices—of $15.67 do reflect sales of good material, invoice prices of $14.70 do not reflect sales of damaged cargo exclusively. See, Modesto Gomez' Deposition, Exhibit # 4, p. 25, Reply to Defendant's Opposition to Plaintiffs' Motion for Partial Summary Judgment, docket entry # 47. Aceros de America and Steel Services, Inc. were the only two clients of Ferromontan who bought the cargo object of the joint survey, that is, of the discount allowance. See, Francisco Garcia and Modesto Gomez'[15] Depositions, Exhibits E & G, docket entry # 32, *supra;* Deposition of Gomez, Exhibit # 4, p. 48 *supra.* The cargo was not segregated between good, bad, heavy rusted, slightly rusted, and/or with zero value. On the contrary, these clients paid for good and bad material mixed together. See, Gomez' Deposition, Exhibit G, *supra,* at pp. 30, 38, 39. In fact, based on Catanzaro's report of March 10, 1998, Gomez deducted from the cost of the good material the proportion of the claim Otto Wolff received from TradeArbed and distributed said allowance between the two clients who bought the cargo. That way, he arrived at the new cost which is reflected in the invoice price of $14.70 corresponding to the sales made to Aceros de America and Steel Services after May 31, 1998. See, *Id.* at pp. 26, 27, 47. In short, in order to sell the material, Ferromontan offered it to said clients at a lower cost which in turn reflects the same discount price that Ferromontan received from TradeArbed. See, *Id.* at p. 39; Distribution of Claim, Exhibit E, Plaintiffs' Memorandum of Law on Proper Method for Computing Damages, docket entry # 31. In view of the above, it is clear that Capt. Simpson's reliance on the $14.70 invoice price as an indicator of the value of the damage cargo[16] and the conclusion that the discount allowance resulted in a windfall to Otto Wolff, are unfounded.

In sum, TradeArbed did not recondition the rebars because the cost of refurbishing would have exceed the degree of the damage. Neither did it resell the cargo at the market rate nor at salvage because, being the market glutted, it would have never received a 67% return. See, Capt. Yoos' Report, p. 3–4, Exhibit # 12, Motion for Partial Summary Judgment, docket entry # 37. Instead, after the surveyors appraised the damaged cargo, TradeArbed sold it to Otto Wolff at a discount price that represented the best measure of mitigation of damages. More over, if the cargo had not been damaged, TradeArbed would have sold the rebars at the previously convened price with Otto Wolff and would have obtained a greater profit than what it eventually received because it would not have had to agree to a discounted price. However, by so doing, TradeArbed absorbed the loss of the damaged cargo. Hence, it is TradeArbed, *ergo,* MOAC and Continental, who must be made whole in this case. Since, there are no adequate values in this case to use the market value formula and the damaged absorbed by the plaintiffs is reflected in the discounted price of the rebars, we find that the discount allowance test is an appropriate measure to calculate damages in this case. The courts have found that

---

15. Mr. Gómez is Ferromontan's Comptroller. He was the person in charge of calculating the new cost of the cargo object of the discount allowance which was deposited and sold to Aceros de América and Steel Services, Inc.

16. We take note that Gomez' deposition was taken the day after Capt. Simpson rendered his expert report.

negotiated discounts to the invoice values for the bill of lading is a reasonable measure of damages. See, *Trade Arbed, Inc. v. M/V Swallow,* 688 F.Supp. at 1107; *Thyssen, Inc. v. S.S. Fortune Star,* 777 F.2d 57, 61–62 (2d Cir.1985) (applying market discount measure of damages to resale of steel pipe by consignee at discount without reconditioning); *Thyssen, Inc. v. S/S Eurounity,* 21 F.3d at 539–540.

■ Finally, the defendants argue that the surveyors' fees, claimed as part of the damages by the plaintiffs are not recoverable. In addition to the actual loss or damage to the cargo, there usually arise necessary expenses incidental to the damage sustained. These expenses include survey fees, necessary transportation, warehousing, and the like. See, *Continental Distrib. Co. v. Reading Co.,* 168 F.2d 967 (3rd Cir.1948). Such incidental expenses are recoverable if they were reasonably considered necessary at the time they were incurred. See, *Santiago v. Sea–Land Service, Inc.,* 366 F.Supp. at 1317. During the deposition of Francisco Garcia, Ferromontan's CEO, he declared that despite the fact that there is a claim or not, Mr. Catanzaro is hired by the company to inspect the condition of the shipments that arrive regardless of whether there is any claim of damage to cargo. See, García's Deposition, p. 13, Exhibit # 5, Memorandum of Law in Support of Opposition to Plaintiff' Motion to Partial Summary Judgment and Defendants' Cross Motion For Partial Summary Judgment, docket entry # 43. This demonstrates that Mr. Catanzaro's survey was part of routine inspections made to shipments delivered to Otto Wolff at the port of San Juan. In other words, said cost is a fixed expense of the company. Clearly then Otto Wolff was not forced to incur in the same due to fault of the defendants. Therefore, Mr. Catanzaro's survey fees are not recoverable.

**WHEREFORE,** for the reasons herein stated, the plaintiffs' motion for partial summary judgment is **GRANTED** and the defendants' cross motion is **DENIED** in part and **GRANTED** exclusively in regards to the survey fees.